UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DIEGO SANTIAGO,

                    Plaintiff,

                                                    **DECLARATION OF**
                                                    **MARK J. WEINSTEIN, ESQ.**
          -against-
                                                    **Index No.** 06 CIV 5422 (CLB)


THE VILLAGE OF OSSINING POLICE
DEPARTMENT,

                    **Defendant.**
-------------------------------------------------------------x

I, Mark J. Weinstein, affirm under penalty of perjury as follows:

1.   I am of counsel in the Law Office of Paul N. Cisternino, P.C., the attorneys representing the plaintiff, Diego Santiago, in the above-entitled action.

2.   This Declaration, the accompanying Memorandum of Law, and Rule 56.1 Statement in Opposition and Plaintiff's Reply to Defendant's Rule 56.1 Statement are submitted in opposition to the Defendant's Summary Judgment Motion.

3.   Attached hereto as Exhibit 1 are the relevant pages of the deposition transcript of the Plaintiff, Diego Santiago, taken April 11, 2007.

4.   Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff's Affidavit, dated December 29, 2007, with Exhibits A and B attached thereto.

5.   Attached hereto as Exhibit 3 is a true and correct copy of Chief of Police Joseph Burton's Affidavit dated December 11, 2007.

6.   Attached hereto as Exhibit 4 is a true and correct copy of Defendant's memoranda sent to Lieutenants and Sergeants for Evaluations to determine promotion to Detective.

Dated: Ossining, NY,
     January 8, 2008

Mark J. Weinstein

EXHIBIT "1"



# ORIGINAL

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------X

5  DIEGO SANTIAGO,

6           Plaintiff,

7      vs.

8  VILLAGE OF OSSINING POLICE
   DEPARTMENT,

9

10           Defendant.

11 ------------------------------X

12

13       DEPOSITION OF DIEGO SANTIAGO

14        New York, New York

15         April 11, 2007

16

17

18

19

20

21

22 Reported by:
   Bonnie Pruszynski, RMR
23 JOB NO. 172176

24

25

Doerner & Goldberg New York * A Veritext Co.
1350 Broadway * New York, NY 10018 * 212-564-8808

1

2

3                                    April 11, 2007

                                     9:55 a.m.

4

5

6

7          Deposition of DIEGO SANTIAGO, held at
LITTLER MENDELSON, LLP, 885 Third Avenue,

8
New York, New York, before Bonnie

9
Pruszynski, a Notary Public of the State of

10
New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



3

1

2 A P P E A R A N C E S:

3 LAW OFFICE OF DAVID J. HERNANDEZ
Attorneys for Plaintiff
4          26 Court Street, Suite 2200
           Brooklyn, New York 11242
5 BY:      MICHAEL S. PAULONIS, ESQ.

6

7 LITTLER MENDELSON
Attorneys for the Defendants
8          885 Third Avenue
           New York, New York 10022
9 BY:      STEPHEN A. FUCHS, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



36

1                     Diego Santiago
2   corrections officer?
3        A        Yes, sir.
4        Q        In what capacity did you work for the
5   Ossining Police Department?
6        A        I was a service worker.
7        Q        I just want to remind you to let me
8   finish the question before you answer.
9        A        Community service worker.
10       Q        What did you do as a community
11  service worker?
12       A        We worked with the youth, resolving
13  youth problems.  And I, being bilingual, was used
14  in other capacities along with police officers.
15       Q        Did you receive any sort of degrees
16  or certifications in youth officer work during
17  that time?
18       A        I was certified first aid, learned to
19  perform first aid.
20       Q        Anything relating to community, any
21  certifications relating to youth or community
22  service at that time?
23       A        Not that I can recall.
24       Q        After you were a corrections officer,
25  what was your next job?

Diego Santiago

44

1
2  the Village of Ossining Police Department in 1982?

3        A        I was a uniform patrol officer.

4        Q        Is that the position you hold today?

5        A        Yes.

6        Q        Has there been any change in your
7  position during your employment with the Village
8  of Ossining Police Department since 1982?

9        A        I have done bicycle patrol, and I
10  believe it's community policing.

11        Q        What is the difference between being
12  a uniform patrol officer and community policing?

13        A        Well, community policing, as I
14  understand it as my job title is I do a lot of
15  public relations, do a lot of walking.  I'm in the
16  business area.  90 percent of the time I spend
17  walking in the local business area.

18        Q        And, obviously, bicycle patrol you
19  are on the bicycle as opposed to being in a squad
20  car?

21        A        Yes, sir.

22        Q        As a uniformed patrol officer, are
23  you always in a squad car?

24        A        Yes, sir.

25        Q        What training did you receive before



57

Diego Santiago

2 translation duties?

3      A      Not that I'm aware of.

4      Q      Do you know who Constable Carlos

5 Castro is?

6      A      Yes.

7      Q      All right.  Do you know whether he

8 ever provides assistance with Spanish-language

9 skills?

10      A      I am not aware of that.

11      Q      You mentioned the Spanish language

12 stipend.  How much is the stipend?

13      A      I believe it's a thousand dollars per

14 year.

15      Q      How long have you been receiving that

16 stipend?

17      A      I believe it's been two or three

18 years.

19      Q      Were you part of the effort to obtain

20 a stipend for officers who speak another language?

21      A      I believe I was the only one that was

22 involved.

23      Q      What was your involvement in

24 obtaining that stipend?

25      A      I spoke to the PBA and negotiations

58

Diego Santiago

1

2 committee, and I said that Spanish-speaking

3 officers were being used a lot more than regular

4 officers for doing translation, and I showed them

5 numbers and victims, of jobs that we were

6 responding to, and they must have agreed with me,

7 and I believe it was admitted to the board or to

8 the chief, and the stipend was finally agreed

9 upon.

10        Q      So, this was brought up by the PBA to

11 the chief and negotiated between the PBA and the

12 police department; is that correct?

13        A      It was presented to the PBA by me and

14 the PBA presented it to, I believe, the village

15 board and to the police chief.

16        Q      Can you recall any other ways in

17 which you use your Spanish-language skills in your

18 current employment as a uniformed patrol officer?

19        A      Wow.   There are so many ways.

20        Q      As best you can remember.

21        A      Interviewing, when we go on roll

22 calls and interviewing suspects and victims, and

23 taking statements, and translating them from

24 English to Spanish and Spanish to English.   And

25 patrol, when they make vehicle and traffic stops,

Diego Santiago                72

1
2  referring in 2001 to the appointment of officer
3  Gerolamo?
4       A       It could be, yes.
5       Q       If I told that you the actual
6  appointment date for Officer Gerolamo was May of
7  2000 instead of 2001, would you disagree with
8  that?
9       A       I couldn't agree or disagree.
10      Q       Did you express interest in the
11 detective appointment that Officer Gerolamo
12 received?
13      A       I have always expressed interest in
14 the detective position.
15      Q       Do you know the normal procedure set
16 forth in Exhibit P-6 and P-7 were followed for
17 Officer Gerolamo?
18      A       I don't believe so.
19      Q       Officer Gerolamo was a youth officer;
20 correct?
21      A       That's correct.
22      Q       And after appointment to detective,
23 did he continue conducting youth officer duties?
24      A       I believe so.
25      Q       Did you have the same qualifications

Diego Santiago                                    73

1
2  to perform youth officer duties as Officer
3  Gerolamo?

4       A       I was able to perform them in '74, I
5  don't see what the difference would be in 2000, or
6  whatever time he was appointed.

7       Q       Do you now what Officer Gerolamo's
8  qualifications in the youth officer field were?

9       A       I'm aware that he went to school for
10 DARE.

11      Q       Did you go to school for DARE?

12      A       No, sir.

13      Q       What is DARE?

14      A       It's to instruct school children
15 against drugs, drug awareness.

16      Q       Do you have a certification as a DARE
17 officer?

18      A       No.  But I believe Officer Gerolamo
19 was sent after he was put in that position.

20      Q       And DARE stands for Drug Abuse
21 Resistance Education?

22      A       I believe so.

23      Q       Were you a certified school resource
24 officer?

25      A       No, sir.  But I believe Officer

77

Diego Santiago

1
2  certifications and traffic training?

3      A      I was never sent to any of those
4  schools.

5      Q      Are you a certified accident
6  investigator?

7      A      I was never sent to that school by
8  the Village of Ossining, but in the police academy
9  I was trained in accident investigation.

10      Q      So, that's a no, you are not a
11  certified accident investigator.

12      A      I have my certificate in my folder
13  that says that I --

14      Q      That says that you what?

15      A      That I am certified in basic accident
16  investigations.

17      Q      Have you completed a commercial
18  vehicle enforcement seminar?

19      A      I was never sent to any of the
20  schools by the Village of Ossining Police
21  Department.

22      Q      Does that mean no?

23      A      That means no.

24      Q      Have you ever completed a course in
25  skid locks and braking systems?



Diego Santiago                                    78

1

2      A       I have never been to the Ossining --

3   Ossining has never sent me to any of those

4   schools.

5      Q       So that's no?

6      A       That's no.

7           MR. PAULONIS:  Just the question,

8   what was the second one you said before?

9           MR. FUCHS:  Commercial vehicles

10   enforcement seminar.

11           Off the record.

12           (Discussion held off the record.)

13           MR. FUCHS:  Back on the record.

14      Q       Officer Santiago, have you ever

15   completed a course in ADS systems?

16      A       No.

17      Q       Are you a certified instruct in laser

18   detection systems?

19      A       I have never been to any schools sent

20   by the Village of Ossining Police Department.

21      Q       Have you ever completed a commercial

22   vehicle weight enforcement course?

23      A       No.  I have never been sent to any of

24   those schools by the Ossining Police Department.

25      Q       Officer, where a yes or no will

Diego Santiago                    79

1
2  answer the question, you can just say yes or no.
3          Have you ever completed a commercial
4  vehicle enforcement course?
5      A    No.
6      Q    Have you ever completed a course on
7  LoJack stolen vehicle police recovery systems?
8      A    No.
9      Q    Have you ever completed a 24-hour
10 course in highway drug investigations?
11     A    No.
12     Q    Have you completed an impaired driver
13 recognition course?
14     A    No.
15     Q    Do you know whether or not Officer
16 Stymiloski had completed any of these courses
17 prior to being appointed a uniform detective?
18     A    No.
19     Q    As far as you can recall, when
20 Officer Stymiloski was appointed, did any memo go
21 out advising the department that there was a
22 vacancy for detective and officers would be
23 considered for detective?
24     A    Not that I'm aware of for that
25 particular spot.

Diego Santiago                                    92

2    Q        And why, in your own words, why is
3  that?

4    A        Experience, knowledge of the streets,
5  past experience in undercover work, working with
6  detectives, working in other jurisdictions and
7  helping questioning suspects.

8    Q        Do you know who made the decision as
9  to who would receive this appointment?

10   A        The Chief of Police.

11   Q        And who received this appointment, if
12 you know?

13   A        I can't quite recall.

14   Q        Would you know whether it was Donald
15 Farrell?

16   A        It could have been.

17   Q        Do you know how many detectives there
18 were after the time of this appointment, when the
19 person was selected for this appointment after
20 June of 2003?

21   A        No.  I can't recall exact number.

22   Q        Do you know if Jose Ferraro was still
23 a detective?

24   A        Yes.

25   Q        Is he still a detective today?

Diego Santiago                          98

1

2          Q        Okay. What are you referring to?

3          A        It was a -- one time that there was

4    something that was posted on my locker, and the

5    hallway and the briefing room referring to scabs.

6    I don't know if they were referring to a scab as

7    Puerto Ricans, but it was directed at me.

8          Q        Okay. What does the word "scab" mean

9    to you?

10         A        To me, it means like a cancer.

11                  MR. FUCHS: Okay. Okay. Let's mark

12         this as document D 10.

13                  (Exhibit Number P-10 marked for

14         identification as of this date.)

15         Q        Okay. Officer is this the document

16   you were just referring to that says "scab"?

17         A        Yes.

18         Q        Okay. And is that your handwriting,

19   posted bulletin board, locker room, 10/28/03,

20   7:40 a.m.?

21         A        Yes.

22         Q        How did you interpret the word "scab"

23   when you saw it?

24         A        That I was like a disease or cancer

25   to the rest of the police department.

Doerner & Goldberg New York * A Veritext Co.
1350 Broadway * New York, NY 10018 * 212-564-8808



Diego Santiago                          99

1

2      Q       Were you familiar with the use of the

3   word "scab" in a labor relations context; in other

4   words, as a unionized worker who operates outside

5   of the union?

6      A       No.

7      Q       You have never heard that expression?

8      A       No.

9      Q       Have you ever heard of scab used as a

10  word related to Puerto Ricans or Hispanics?

11     A       Not that I can recall.

12     Q       Okay.  Can you tell me what the

13  article upon which the word "scab" is written

14  refers to?

15     A       I guess it was an article as to why I

16  haven't been promoted to detective.

17     Q       It refers to a petition by members of

18  the community; correct?

19     A       Yes.

20     Q       Did you organize that petition?

21     A       No, sir.

22     Q       Did you have anything to do with the

23  petition being circulated?

24     A       No, sir.

25     Q       Did you discuss with anyone the

Diego Santiago                          100

1
2    petition being circulated before it was
3    circulated?
4        A      No, sir.
5        Q      Did you speak to the press with
6    respect to this article?
7        A      No, sir.
8        Q      So, this petition in this article
9    came about through no act of your own; correct?
10       A      That's correct.
11       Q      Have you ever been criticized for
12   operating -- withdraw that question.
13              Have you ever received criticism
14   because you did not use the procedures of your
15   union to air your complaints?
16       A      Not that I'm aware of.
17       Q      Now, when you saw -- withdraw that.
18              Where in the locker room was this
19   article posted?
20       A      To my locker, it was in the entrance
21   to the locker room, a little lobby that is there.
22   It was in the briefing room.
23       Q      And, to this day, are you aware of
24   who posted this article?
25       A      No, I'm not.

Diego Santiago                    105

1

2      Q      Okay.  Is it fair to say that number

3  of arrests that you have had in the last few years

4  has been lower than that of the average patrol

5  officer?

6      A      Yes.  Because the position I am in

7  now, I am not in a position to make a lot of

8  arrests.

9      Q      Why is that?

10     A      Because as I stated before, I spend

11 three hours with day laborers, and the rest of the

12 tour I spend walking in the business area of

13 Ossining.  And I also do taxi inspections and I

14 also do licensing of hack licenses.

15     Q      Okay.  Since the beginning of 2004,

16 has anyone spoken to you about a lack of

17 initiative or motivation on your part?

18     A      No, sir.  Because according to the

19 evaluations I received, I'm doing better than --

20 close to excellent work in all aspects of my work.

21     Q      Has anyone spoken to you about a

22 failure to cooperate with detectives or with the

23 department?

24     A      No, sir.

25     Q      Do you know who George Byrne is?

Diego Santiago                    119

1

2      A      Well, three that I found, and some
3  officers that are friends of mine had been there a
4  long time, had the decency to remove them and get
5  rid of them before they came in, and there were
6  certain supervisors that saw them and neglected to
7  do it.

8      Q      Other than the posting of the
9  article, did anything happen to you because the
10  article appeared in the local newspaper?

11      A      Did anything physically or mentally?

12      Q      Anything relating that you can
13  describe, anything related to --

14      A      I can describe that when I call out
15  for a vehicle, I don't get the back up.

16      Q      And you think that is because of the
17  petition or the article?

18      A      I don't know if it was the petition
19  or the article or what.

20      Q      So, when you say you don't recall,
21  you call in, you don't get the back up, what are
22  you referring to?

23      A      I feel like I am being left alone out
24  there.

25      Q      Why do you think that is happening?

EXHIBIT "2"



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
DIEGO SANTIAGO,

            Plaintiff,

                         **AFFIDAVIT OF
DIEGO SANTIAGO**

    -against-

                       **Index No.**  06 CIV 5422 (CLB)

THE VILLAGE OF OSSINING POLICE
DEPARTMENT,

            Defendant.

--------------------------------------------------------------x

STATE OF NEW YORK       )
                        ) ss:
COUNTY OF WESTCHESTER )

    Plaintiff, DIEGO SANTIAGO, being duly sworn, deposes and says:

1. I am the Plaintiff in the above-entitled action.

2. I have worked for the Village of Ossining Police Department since 1982 as a uniform patrol officer. I have a consistently good attendance record.

3. Currently as a patrol officer I work mainly in the business district and engage in community policing.

4. As such, based on my years in the department and my assignments, I have become a well-regarded police officer in the community.

5. I have also worked previously for New York State as a Corrections Officer, Village of Ossining Police Department as a Community Service Worker, and the

Westchester County Police Department. I also was assigned to the Yonkers Police Department, Narcotics Unit as an undercover narcotic officer.

6. Since the inception of the Defendant's "formal" performance evaluations in 2006, I received an "excellent" evaluation.

7. I have also informally received two (2) above average to excellent evaluations in 2004 and 2005.

8. In or about 2003, I was the only officer responsible for obtaining a one thousand dollar ($1,000.00) stipend for officers who speak a second language. I facilitated negotiations with my PBA to the Chief of Police Joseph Burton and the Ossining Village Board. The second language stipend primarily benefits Spanish-speaking officers.

9. Chief Burton was opposed to this stipend.

10. As of early, 2008, out of the Defendant's sixty (60) officers, ten (10) are Hispanic/Latino-speaking police officers. Out of five (5) detectives for the Defendant, one is Hispanic and none are Puerto Rican. There are no Puerto Rican detectives currently, and there has never been one appointed or promoted. There has only been one (1) Hispanic/Latino ever appointed to Detective.

11. I was passed over for two competitive and two non-competitive promotions in the years 2000, 2002 and 2004 (two appointments).

12. Upon information and belief, in or about May, 2000, Defendant promoted Patrol Officer John Girolamo to the rank of Detective.

13. Upon information and belief, Patrol Officer John Girolamo was certified as a Drug Abuse Resistance Education ("DARE") officer after he received his promotion.



14. Upon information and belief. Patrol Officer John Girolamo was non-Hispanic and non-Puerto Rican.

15. I had more seniority than Patrol Officer Girolamo and had also worked previously for the Defendant before I was a Patrol Officer as a "community service worker", working with youths and resolving youth problems. I was also worked for the Defendant as an interpreter in criminal and civil cases.

16. On June 24, 2002, Patrol Officer Jose Ferrao was appointed to the Detective position through a competitive process.

17. Patrol Officer Ferrao was not Puerto Rican.

18. I had more seniority and experience than Patrol Officer Ferrao.

19. An article was written in a local newspaper in October, 2003 concerning a rally and a petition that was circulated in the Ossining community encouraging the Defendant to promote me to Detective. (Exhibit A).

20. The article quoted Sundiata Sadiq, President of Ossining NAACP as stating, "I believe Diego (Plaintiff) based on the racist history of the Ossining Police (Defendant) has been passed over because of his race." *Id.*

21. On October 28, 2003, the article was posted on my locker and in the Defendant's hallway and briefing room with the word "Scab" written on it. *Id.*

22. I sent an E-Mail to Chief Burton on October 28, 2003 stating that I felt "violated, disrespected, and humiliated" and I requested an investigation. (Exhibit B).

23. Upon information and belief, to date, there has been no investigation of this incident.

24. To date, I do not know who posted the article.

25. After this article was posted in my locker and Defendant's hallway and briefing room, I felt isolated and alienated by my co-workers and supervisors.

26. After these incidents, Defendants promoted two (2) Patrol Officers to the position of Detective in 2004.

27. Defendant promoted Patrol Officer Paul Stymiloski to the rank of Detective in 2004 through a non-competitive process. As such, I was never informed that there was a vacancy for the position.

29. Upon information and belief, Patrol Officer Stymiloski was non-Hispanic and non-Puerto Rican.

30. I was better qualified than Patrol Officer Stymiloski. This is based on my past experience as an undercover police officer; being used in surrounding communities to investigate crimes; and based on my collaboration with Defendant's detective division in criminal investigations.

31. I was never afforded the opportunity to attend the specialized traffic management and accident investigation classes and schools that Patrol Officer Stymiloski was afforded.

32. In or about 2004, Defendant appointed Patrol Officer Donald Farrell to the position of Detective through a competitive process.

33. I had more experience and was better qualified than Patrol Officer Donald Farrell.

34. Upon information and belief, Patrol Officer Donald Farrell was neither Hispanic nor Puerto Rican.

35.  I was better qualified than Patrol Officer Farrell.  This is based on my past experience as an undercover police officer; being used in surrounding communities to investigate crimes; and based on my collaboration with Defendant's detective division in criminal investigations.

36.  Currently, the Defendant does not have an internal Equal Employment Office (EEO) to reports complaints of discrimination.

Diego Santiago

Sworn to and subscribed to me
on this 7th day of January, 2008

Notary Public

11/28/2010

EXHIBIT "A"



# Residents rally to have Hispanic Ossining police officer become detective

by Adam Stone

A little over five weeks ago, Miguel or John Perilla rejected the notion that racial diversity within the department should be a focus.

"We want to do things for the right reasons, not the wrong reasons," Perilla said.

Many petitioners contend Santiago has been unfairly passed up for the position because he is Hispanic.

The officer of 22 years in the department was unavailable for comment.

Chief Joseph Burton said, "I'll see what their concerns are, but we must do something."

Currently, there are no openings for a detective appointment, Burton said.

Resident Maxine Lawrence issued the petition to the Board of Police Commissioners with the notion that racial diversity within the department should be a focus.

A congregation of roughly 60 Ossining residents signed a petition that encourages the Police Department to appoint Officer Diego Santiago to detective.

valid the apartment.

"So significant," Lawrence said that it actually "Not one of that inasmuch as there has been bias of ... discrimination ... over the ..."

In his seven years as chief, Burton has recognized two detective appointments, one of the late detective José Ferrer, who is Hispanic, as picked for the position. Ferrer, who does not speak Spanish, was plucked from the ranks after a review process that included a no-less-a-dozen interested parties, including Santiago.

"Hopefully, we've gone beyond skin color," said Burton, noting four lieutenants and seven sergeants were involved in the evaluation process.

Officers who signed the petition formed their argument focusing on race, and more on the necessity for the department to offer the position to a well-respected officer who speaks Spanish.

Cecil, Gutierrez is the president of the Ossining Hispanic Action Coalition.

"It is a classic example of police community relations," Gutierrez said. "Officer Santiago has been involved with just about every communication activity in town. He is recognized by everyone in town from every cultural background. He has been an instrumental force in communication between the police and the Spanish community."

# Police union steps into political ranks

Others cite more subtle discrimination.

EXHIBIT "B"



**Date/Time Sent:** 10/28/2003 05:51:48 PM

**Subject:** INCIDENT OF 10/28/03 030 HRS

**Message:** CHIEF BURTON ON TUESDAY OCTOBER 28,2003 AT APPROXIMATELY 7:40AM WHILE REPORTING FOR DUTY I WALKED INTO THE LOCKER ROOM AND UPON ENTERING WHERE THE BULLETIN BOARD IS LOCATED I OBSERVED A COPY OF AN ARTICLE FROM THE NORTH COUNTY NEWS WHICH WAS PRINTED SEVERAL WEEKS AGO, IN WHICH AN INQUIRY WAS MADE REGARDING A SPANISH SPEAKING DETECTIVE, WHERE MY NAME WAS ALSO MENTIONED. ( I HAD NOTHING TO DO WITH THIS ARTICLE OR SAID PETITION AS YOU KNOW) WRITTEN ON TOP AND ACROSS THIS ARTICLE IN BLACK MAGIC MARKER WAS THE WORD SCAB .NOT ONLY WAS THIS PLACED IN THE BULLETIN BOARD IN THE LOCKER ROOM BUT ,THE BRIEFING ROOM, TO MY LOCKER AND VARIOUS OTHER AREAS.AS YOU KNOW I HAVE BEEN INVOLVED IN LAW ENFORCEMENT SINCE 1974 WHEN I WAS WITH THE VILLAGE OF OSSINING AND CONTINUED SERVING THIS VILLAGE SINCE . DURING THIS TIME I WAS NEVER SO OFFENDED UNTIL THIS MORNING WHERE I FELT VIOLATED, DISRESPECTED AND HUMILIATED . I BELIEVE THAT I HAVE SERVED THIS DEPARTMENT ABOVE AND BEYOND THE CALL OF DUTY AND EARNING THE RESPECT OF NOT ONLY THE MAJORITY OF THIS DEPARTMENT BUT ALSO OTHER DEPARTMENTS IN WESTCHESTER COUNTY AS WELL AS THE RESPECT OF THIS COMMUNITY. I WOULD APPRECIATE A FOLLOW WITH THIS MATTER AS I BELIEVE THAT THOSE RESPONSIBLE SHOULD NOT BE INVOLVED IN LAW ENFORCEMENT, AND ARE REPRESENTING THIS DEPARTMENT , WHICH I HAVE FAITHFULLY REPRESENTED AND WILL CONTINUE TO DO SO.

WITH ALL DUE RESPECT
P.O. SANTIAGO 102

D 0614



EXHIBIT "3"

12/11/2007 15:43   9147622679   FROM-LITTLER MENDELSON   T-039 P.002/008 F-327   PAGE 02



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Diego Santiago,                              Index No. 06 CV 5422 (CLB) (GAY)

            Plaintiff,

      -against-                              **AFFIDAVIT OF CHIEF OF POLICE**
                                             **JOSEPH BURTON, JR.**

The Village of Ossining Police Department,

            Defendant.

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF WESTCHESTER )

CHIEF JOSEPH BURTON, JR., being duly sworn, deposes and says:

1.    I am the Chief of Police of the Village of Ossining Police Department ("the Department"). I have held this position during all times relevant to this action. I make this affidavit in support of Defendants' Motion for Summary Judgment seeking dismissal of the complaint with prejudice. The statements set forth below are made from my personal knowledge as Chief of Police during all relevant times.

2.    Officer Diego Santiago's allegation that he was denied appointment to the position of Police Detective on the basis of is race or national origin is false. Decisions to appoint police officers to the position of Detective are made based on a non-discriminatory procedure, based upon an evaluation of legitimate, non-discriminatory, and job-related criteria. Indeed, of the Department's five Detectives, one, Jose Ferrao, I am aware is Hispanic or Latino of Brazilian national origin. I selected Detective Ferrao for appointment in June 2002. Additionally, one of the nine Sergeants in the Village of Ossining Police Department, George

12/11/2007  15:43   9147622679                                        PAGE  03
2007-12-11  10:15am  From-LITTLER MENDELSON                    T-039  P.003/008  F-327

Byrne, I am aware happens to be of Mexican national origin. I selected Sergeant Byrne for promotion in February 2005. Sergeant Byrne also speaks fluent Spanish.

3.      When there is a vacancy for the appointment of a police officer to the position of Detective, I send out an email advising the Department of the vacancy, and any officer who is interested may apply for appointment to the position by submitting a cover letter and resume. A true and accurate copy of the email sent out in regarding a vacancy for the Detective position in 2004 is attached hereto as Exhibit A. The procedure set forth below is then applied to select the most qualified police officer among all interested applicants for the position.

4.      First, all Sergeants and Lieutenants in the Department are provided an evaluation form, listing a number of job related criteria including performance areas such as supervisory skills, handling assignments, knowledge of laws and ordinances, community interaction, comprehension of police procedures, and report writing, and behavioral dimensions such as leadership skills, communications skills, and police ethics. A true and accurate copy of the memoranda sent to Sergeants and Lieutenants for the Evaluations in 2004 is attached hereto as Exhibit B. Neither ability to speak Spanish nor seniority are factors in the evaluations given to the Sergeants or the Lieutenants. With the evaluations, the Sergeants and Lieutenants are given the resumes of all interested police officers, and are instructed to evaluate each candidate with respect to the job-related criteria, giving them an overall ranking from first to last.

5.      The evaluations are then returned to me, and I review each one. I consider the content and overall rankings set forth in the evaluations. The Sergeants and Lieutenants' evaluations are used as input, but are not dispositive, of which candidate I choose to appoint to the Detective position. Once all evaluations have been completed and reviewed, I consult the Lieutenant in charge of the Detective Division, Detective Lieutenant William V. Sullivan, to

2

12/11/2007  15:43    9147622679
2007-12-11  10:15am  From-LITTLER MENDELSON                    T-039  P.004/008  F-327

discuss the candidates. The Lieutenant makes a recommendation as to which candidate he believes will do the best job as a Detective. I then consider all of the above information, and appoint the strongest candidate for the Detective position.

6.      This process occurred only twice during the time period raised by Officer Santiago in his Complaint—in 2002 and 2004. On neither occasion was officer Santiago evaluated high enough for him to be appointed to the Detective position.

7.      With respect to the Detective appointments for which Officer Santiago claims he applied, no police officers were appointed to the Department's Detective Division in 2001 or 2003. Accordingly, Officer Santiago was not denied a Detective appointment in those years.

8.      On May 8, 2000, Police Officer John Girolamo was appointed to Detective within his duties as a Youth Officer, without any change in his duties. This was a distinct, non-competitive appointment for which there was no selection or evaluation process, unlike the later 2002 and 2004 appointments. No applications were solicited for the appointment; and no other Police Officers within the Department were qualified for this appointment. Officer Girolamo had been working as a Youth Officer and was a certified Drug Abuse Resistance Education ("D.A.R.E.") and a certified School Resource Officer ("S.R.O."). Officer Santiago did not have these qualifications, and neither he nor any other Police Officer were denied the Detective appointment that Officer Girolamo was granted.

9.      On August 30, 2004, Police Officer Paul Stymiloski was appointed to a uniformed Detective position within his duties as a Traffic Specialist, without any change in those duties. This appointment was distinct from all other appointments, and Officer Stymiloski was the only Department member considered for this appointment because of his unique experience in use of traffic equipment, details, certifications, and training. This was not a

3

competitive appointment, and no applications were solicited from other Police Officers in the Department. Officer Stymiloski alone was performing the Traffic Specialist duties prior to his promotion. He was a certified Accident Investigator, and had completed several relevant traffic specialist courses and seminars that other Department members had not completed, such as Commercial Vehicle Enforcement, Skid Locks and Braking Systems, LoJack Stolen Vehicle Police Recovery Systems, and other traffic systems courses.

        10.    No evaluations were completed for Officer Stymiloski's appointment to Detective, and Officer Santiago had never expressed interest in this appointment. Neither Officer Santiago nor any other Department members were therefore denied a Detective appointment at the time Officer Stymiloski received the appointment.

        11.    On June 24, 2002, Police Officer Jose Ferrao, who is known to me to be Hispanic or Latino of Brazilian national origin, was appointed to a Detective position. I announced Ferrao's appointment in an email to the Department on May 24, 2002, which also explained the process used to reach my decision. A true and accurate copy of my May 24, 2002 email is attached as Exhibit C. Detective Ferrao was chosen as the strongest candidate for the position at that time over all other candidates based upon, among other qualities, his leadership skills, knowledge of laws, attendance, and application of Department procedures. Officer Santiago was not among the top candidates for this appointment based upon these criteria. Neither the ability to speak Spanish, nor seniority, were criteria for appointment to Detective.

        12.    On September 27, 2004, I appointed Police Officer Donald Farrell to the Detective position. The Sergeants and Lieutenant again evaluated Donald Farrell highest in terms of his performance, and Detective Lieutenant Sullivan and I agreed that he was the strongest remaining candidate for Detective appointment. Officer Farrell was chosen as the best

4

12/11/2007  15:43  9147622679                    0                          PAGE  06
2007-12-11  10:17am  From-LITTLER MENDELSON

candidate at the time because of his particular strengths in knowledge of laws and ordinances, leadership skills and attendance, among other qualities. Officer Santiago did not rank high enough to be appointed for this Detective position. Of some eleven officers applying for the position in 2004, Officer Santiago was in the bottom half of the candidates, in the view of his superiors. Neither the ability to speak Spanish nor seniority were criteria for selection to the Detective position.

13.    Officer Santiago's race and national origin did not play any role whatsoever in his not being appointed to the Detective position in either 2004 or 2002. Rather, on both occasions, he was not selected by me for the appointment because he was not evaluated among the most qualified candidates for the appointment by the Sergeants and Lieutenants who worked with him, applying the performance and behavioral criteria set forth in the evaluations, he was not recommended by the Lieutenant in charge of the Detective Division as the strongest candidate for the appointment based, and he was not, in my judgment, the strongest individual candidate for appointment to Detective.

14.    Other individuals who happen to be of Hispanic or Latino race and national origin have been selected for appointment to the Detective Division, and to the even more prestigious position of Sergeant. The procedure for appointing Sergeants is similar to that used to appoint Detectives; the only difference is that the candidates are determined by a Civil Service Examination, rather than by submission of a resume and cover letter.

15.    Specifically, the Department currently employs five Detectives out of 60 officers. Of those five, one, Jose Ferrao, is Hispanic or Latino. Of the Department's 60 officers, ten are Hispanic or Latino.

5

12/11/2007  15:43   9147622679                O                              PAGE   07

16.     The Department also has nine Sergeants, each of whom are selected through a procedure which is similar to that used to select Detectives, except that the candidates are determined by a civil service eligibility list which determines the top three candidates. The position of Sergeant outranks the position of Detective. When there is a vacancy for Sergeant, I select the candidate for promotion, with the input of the Lieutenants and Sergeants. Of these nine Sergeants in the Department, one, George Byrne, is known to me to be of Mexican national origin and speaks fluent Spanish. I selected George Byrne for promotion to Sergeant in February 2005. Sergeant Byrne was officially appointed to Sergeant by resolution of the Village of Ossining's Village Board on February 16, 2005, before the Department received Officer Santiago's EEOC charge. A true and accurate copy of the February 16, 2005 Village of Ossining Board of Trustees resolution appointing George Byrne to the rank of Sergeant is attached hereto as Exhibit D. A true and accurate copy of Officer Santiago's United States Equal Employment Opportunity Commission Charge bearing the Department's internal stamp indicating that it was received on March 4, 2005 by the Department is attached hereto as Exhibit E. I was completely unaware of Officer Santiago's Complaint of Discrimination until the Charge of Discrimination was received.

17.     Officer Santiago receives a stipend of $1000 per year from the Department as additional compensation for application of his bilingual abilities. Five other officers also receive stipends for their bilingual abilities, two of whom, Officer Antonio Rodriguez, and Officer Jafeth Chavez, receive the stipend for Spanish fluency.

18.     Officer Santiago's Spanish language skills are not unique to the Department. Other current and former employees of the Department and Village of Ossining who speak Spanish and who have been used by the Department as translators during the relevant time

12/11/2007  15:43    9147622679                                                                    PAGE  08

period include the aforementioned Officers Rodriguez and Chavez, Marvise Rennalls, Joseph Bracero, Juan Encarnacion, Johnathon Colon, Javier Lugo, Gregory Jacquin, and Village Court Constable Carlos Castro.

19.    Before Officer Santiago filed a charge with the Equal Employment Opportunity Commission, he never came to me to voice his belief that the Detective appointments or the Detective appointment procedures were discriminatory.

20.    Accordingly, Officer Santiago's allegations that he has been denied promotions on the basis of his national origin or retaliated against for complaints of discrimination are entirely without merit.

21. The petition and related rally occurring in October 2003, in which a number of individuals urged the Department to appoint Officer Santiago to the position of Detective, was not a factor in any manner in the selection of individuals other than Officer Santiago to the position of Detective.

_____
Chief Joseph Burton, Jr.


Sworn to and subscribed before me this
         11    day of December, 2007

_____
              Notary Public

RAYMOND R. BAALAAM
Notary Public, State of New York
No. 4xxx721
Filed in Westchester County
Term Expires  8/31/10

7

EXHIBIT "4"

# MEMORANDUM

TO:      ALL LIEUTENANTS AND SERGEANTS

FROM:   CHIEF J. BURTON

REF:     EVALUATIONS

DATE:   25 JUNE 2004

Attached find resumes submitted by eleven officers who have applied for consideration to the appointment of detective. All lieutenants and sergeants will review these resumes and;

1. Rate the candidates on the attached personnel performance evaluation guide.
2. Rank in the candidate with an overall rating.
3. Your candid opinion of the candidates you are evaluating.
4. All candidates will be evaluated.

**All lieutenants and sergeants will** forward the evaluation form to me by July 6th. Resumes can then be shredded, and as with all other evaluations they will be held confidential.

D 0607

# VILLAGE OF OSSINING POLICE
## PERSONNEL PERFORMANCE EVALUATION GUIDE

This is a performance evaluation form in reference to police officers that have applied for an appointment in the detective division. This form will **be completed by all supervisors and returned to the Chief's office by July 6th.**

Your evaluation will be the first phase of screening applicants for an appointment of a police officer into the detective division. When performing this personnel evaluation of the candidates, the rater is asked to place a numeric value on the officers overall performance in numerous categories. In an effort to make these numbers have a more tangible value the following thoughts should be used when deciding on and assigning this number.

Numeric Rating System Guidelines:

**5 – Extremely Competent** – consistently exceeds job requirements

**4 – Highly Competent** – self motivated and consistently fulfills job requirements

**3 – Competent** – fulfills job requirements

**2 – Low** – supervisory counseling/training required

**1 – Very Low** – supervisory counseling/training essential

In addition to assigning this number, the rater should provide a short statement or narrative that supports their decision and the number assigned. Often the supervisor's narrative portion of any evaluation reflects more about the officer's performance than a number evaluation system no matter how complete. Comments may range from an endorsement of an officer to the other end of the spectrum, negative feelings. Your honest, candid opinion is required for proper evaluations.

**Overall rating** is where you believe this candidate rates among the other candidates you are evaluating.

These evaluations will be held strictly confidential and destroyed upon completion of their assessment.

D 0608

**Performance Areas**                         **Rating**

1. Community Interaction          ____
2. Victim/Prisoner Interaction    ____
3. Processing Arrests             ____
4. Report Writing                 ____
5. Handling Assignment(s)         ____
6. Supervisory Skills             ____
7. Comprehension Police Procedures ____
8. Knowledge Laws & Ordinances    ____

**Behavioral dimensions**                     **Rating**

1. Police Ethics/ Integrity       ____
2. Comprehension Skills           ____
3. Communication Skills           ____
4. Reasoning Ability              ____
5. General Attitude               ____
6. Problem Recognition            ____
7. Visualization                  ____
8. Memorization                   ____
9. Judgment                       ____
10. Innovativeness                ____
11. Adaptability                  ____
12. Leadership Skills             ____
13. Drive/Initiative              ____
14. Interpersonal Skills          ____
15. Appearance/Professional Image ____
16. Physical Fitness              ____
17. Attendance                    ____

**Overall Rating:**               ____

Evaluator's Comments that include recommendation:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Use back of form is needed.

Evaluator' signature: _____

OPD 1

D 0609

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**          <u>INDEX NO.</u> 06 CIV 5422

---

### DIEGO SANTIAGO, Plaintiff

### -against-

### THE VILLAGE OF OSSINING POLICE DEPARTMENT, Defendant

---

### DECLARATION OF MARK J. WEINSTEIN

---

Law Office of Paul N. Cisternino, P.C.
16 Briarbrook Road
Ossining, New York 10562
Phone (914) 330-1527
Fax (914) 923-8913

- Attorneys For Plaintiff -